## TEXAS EMPLOYERS' INS. ASS'N v. KELLY et al.*

### No. 12732.

Court of Civil Appeals of Texas. Fort Worth.
Nov. 19, 1932.

Rehearing Denied Dec. 24, 1932.

C. T. Gettys, of Decatur, and Todd & Crowley, T. D. Starnes, Jr., and S. A. Crowley, all of Fort Worth, for plaintiff in error.

McCormick, Bromberg, Leftwich & Carrington, of Dallas, and Raymond E. Buck, of Fort Worth, for defendants in error.

LATTIMORE, Justice.

This is an appeal from a judgment in favor of Mrs. Kelly against appellant for workmen's compensation for the death of her husband, James E. Kelly, as an employee of the Texas Worth Tool Company, a corporation.

G. W. Mennis was president, general manager, and sales manager of the Texas Worth Tool Company. He also had in his individual right considerable oil properties and an airplane. When this airplane was used in the corporation's business, it paid for such use. Some three months before the accident, Mennis made an arrangement with deceased, Kelly, that he, Kelly, would pilot Mennis' airplane, as and when needed, for $10 a day and expenses, and he actually so worked on an average of three days a week. Each time Mennis reported his expenses of such trips, he included as such the $10 a day and expenses to Kelly, and the corporation paid same. On this occasion, Mennis, piloted by Kelly, went from Fort Worth to Oklahoma City on company business, by way of Wichita Falls, where he had personal business. Returning from Oklahoma City to Fort Worth, bringing a prospective company employee to show him the Texas Worth Tool Company establishment at Fort Worth, the plane crashed in Wise county, and Mennis and Kelly were killed.

The Texas Worth Tool Company carried workmen's compensation insurance with appellant company. Kelly's pay was not included in the pay roll of the company, on which premiums for the policy sued on were computed.

On special issues the jury found that Kelly was an employee of the Texas Worth Tool Company, was in the course of his employment, was not in the employ of Mennis, that $70 a week was an average weekly wage, fair and just to all parties, and that Mennis was not an independent contractor on this trip, nor was deceased, Kelly.

█ It has been a pleasure to study the well-ordered brief of counsel for appellant, who contend the undisputed evidence shows Kelly was an independent contractor, or, to put it where the burden of proof lies, that the evidence does not show Kelly to have been the company's employee, and propound five elements of the six set out in Shannon v. Western Indemnity Co. (Tex. Com. App.) 257 S. W. 522, by which an independent contractorship is tested:

*Writ of error granted.

(1) Is a person under obligation to work exclusively for the person claimed to be his employer?

(2) The manner in which the person is to be compensated.

(3) Does the claimed employer furnish the materials and appliances for the work?

(4) Is the work generally and distinctly recognized as employment?

(5) Who has the right to hire and fire? Security Union Ins. Co. v. McLeod (Tex. Com. App.) 36 S.W.(2d) 449.

(6) Who has the right to exercise the ultimate control over the details of the work? As evidentiary of the issue set out in No. 6, who exercised such control? Southern Surety Co. v. Shoemake (Tex. Com. App.) 24 S.W.(2d) 7.

We agree that each of the above are proper instruments to be used in measuring the case, though the first five are assistant to No. 6, which generally must be satisfied to reach a conclusion. Also, generally, each case must stand on its own legs, looking at all the facts and circumstances.

In this case the fact that Kelly was free to follow other employment at other times is not entitled to much weight. It was not a type of work which required his constant attendance on his employer to accomplish that portion of the company's business which was in the line of work done by Kelly. The compensation of $10 a day and expenses, without regard to how much or how little work was done, was indicative of the relation of master and servant. As far as Kelly was concerned, the Texas Worth Tool Company was supplying the materials and appliances for his work, i. e., he was not supplying them, and the person who did furnish them had the right to stand in loco the company, and, according to the belief of the jury, under circumstances justifying their belief, did so.

The fourth element is by the development of our industrial and social fabric becoming of lesser importance. Attendance upon the needs of the human race has become more and more specialized—the gardener of yesterday is the horticulturist of to-day, with his assistants, the tree surgeon, the soil analyst, the landscape artist, and their apprentices. Each brings to the task learning not had by his employer—so also the growth of "Big Business," the increasing co-ordination of service in not only various communities, but also the nations under one executive head, until now it is not uncommon for one corporation to guide the distribution of that service on opposite sides of the globe. Such gigantic organizing makes necessary the employment of the scientific learning of individuals which may be peculiar to them alone. Our huge department stores employ social service workers practicing a highly specialized profession; our railroads hire engineers who must stand a scientific examination; and doctors, chemists, and geologists find themselves hired to serve alone the will of a corporation, although such service requires the application of methods known only through long study and experiment, which application the employer may have a right to direct, but which he dare not, lest his unscientific interference wreck the very thing the employee is hired to do. Coming to the peculiar matter of flying an airplane, recent years have seen tremendous development of commercial flying service with corporations capitalized to the millions of dollars, hiring all their pilots as wage-earners, with the undoubted relation of master and servant. The courts have not found it difficult to apply the law to the situation, declaring pilots employees where the facts justified it. Hinds v. Dept. of Labor & Industries, 150 Wash. 230, 272 P. 734, 62 A. L. R. 225; Famous Players Lasky Corp. v. Industrial Accident Comm. of California, 194 Cal. 134, 228 P. 5, 34 A. L. R. 765; Stites v. Universal Film Mfg. Co., 2 Cal. Ind. Acc. Comm. 653; Constitution Indemnity Co. v. Shytles (C. C. A.) 47 F.(2d) 441; Schonberg v. Zinsmaster Baking Co., 173 Minn. 414, 217 N. W. 491.

From what has been said it is apparent that the test of ultimate right to control the details of the work is not to be confused with the ability to do so wisely. The president of a railroad probably has the contractual right to tell an engineer what steam to carry in his boiler, but leaves this to the trained mind of the engineer, realizing that probably he would, if he interfered, be

> "Right, right, right as he rolled along
> But just as dead as if he were wrong."

Kelly came and went as Mennis directed; that Mennis did not tell him when to kick out his rudder bar, or when to "gun" the ship, carries no contradiction of the duty of Kelly to obey his employer. It merely recognized the specialized nature of Kelly's employment. This principle is best illustrated by the Famous Players Lasky Corp. Case, supra, where the pilot was told to fly at a named height; he at first declined, then obeyed, and was killed. This record is wholly void of any evidence that Kelly exercised or claimed any control over his work and exercised none except such of those details that were beyond the ability of his employer; i. e., the flying of the airplane. He went when, where, and by that route and carried those people and that baggage as his employer told him to do.

The right to hire and fire Kelly was in Mennis, whether Kelly was working for Mennis or for the Texas Worth Tool Company. So this element sheds no light on this case and differentiates it from the McLeod Case,

supra. While Kelly was not carried on the pay roll of the Texas Worth Tool Company, as that document was properly called, still that company was knowingly and 'intentionally paying his hire of $10 a day under the head of expenses of General Manager Mennis on company business.

The "usual course of the trade, business, profession or occupation" of the Texas Worth Tool Company was inter alia to find purchasers for its rock bit cones. To employ a driver for a vehicle to carry those representing the company to confer with salesmen regarding making a sale of its products seems as much the usual course of business as to employ a driver of a vehicle to deliver the products after same are sold. Constitution Indemnity Co. v. Shytles, supra, interpreting the Texas Compensation Law, which is cited with approval in Commercial Casualty Ins. Co. v. Strawn (Tex. Civ. App.) 44 S.W.(2d) 805.

■ The issue of amount of compensation was submitted under the third subdivision of section 1 of article 8309, Rev. Statutes of 1925. While there is some doubt whether there is sufficient evidence to raise the issue of determination of amount under subdivision 1 or 2 of section 1 of article 8309, we need not enter into a lengthy discussion of the evidence, for it appears that the minimum wage paid pilots in regular employment, according to testimony most favorable to appellant, was $50 a week. So that 60 per cent. of same would much exceed the maximum compensation of $20 a week allowed by statute. Thus, if any error was made in the law applicable to determining the amount a week, it was harmless. Bankers' Lloyd's v. Chamness (Tex. Civ. App.) 31 S.W.(2d) 1108.

■ Numerous objections are made to the refusal of the court to declare a mistrial for remarks of counsel for appellee. Appellant objected to questions propounded by appellee to a witness, whereupon counsel for appellee stated: "You went into it and now when I do, you raise an objection," and twice offered that both sides withdraw all objections to all testimony and let every witness tell "what they want to." We cannot too severely condemn the practice of side bar remarks by counsel. It does no good, has no effect except to stir up prejudice and appeal to ignorance. It takes the jury's minds off of the legitimate facts, and creates in the minds of the jury and witnesses an impression that the suit is a contest between lawyers, not between right and wrong. It has been publicly condemned by the American Bar Association, is forbidden by rules of our Supreme Court, and should be sternly quelled by the trial judge. If officers of the court set an example of defiance of those rules which experience has formulated for us, how

can they expect the citizenry to hold the courts, including therein the bar, in that esteem so essential to the orderly conduct of our affairs? We presume that the trial judge would have promptly stopped the remarks and instructed the jury appropriately if counsel for appellant had objected. This he did not do, but only demanded the discharge of the jury. We do not believe the offense to be of any·such gravity.

■ Counsel for appellee stated in argument to the jury:

"We have here the defendants in this case engaged in what we presume was the lucrative business of writing insurance upon the sacred laborers of this state for profit. They didn't have to engage in that business but they did it because it lined the pockets of the stockholders with silver. They are called upon now to make good the risk which they assumed. * * *

"They say a pilot isn't included in that policy and that they didn't get money for that and that if they pay this out, why it will take money they want to pay out in dividends. I will answer that later. * * *

"When this case is brought to you, who do you find here defending the sacred treasury of these insurance companies? Do you find the estate of G. W. Mennis or the Texas Worth Tool Company? No, you do find the two insurance companies crying out with the pain of financial penalty; crying out about an honest debt they agreed to pay when they wrote that debt at so much per thousand."

The evidence shows that appellant offered testimony that premiums were estimated on the pay roll, and that they had received no premium on the pay of deceased, Kelly. Counsel for appellant admit that no objection was made to this argument until after the speech of counsel was concluded and the jury had retired. It will serve no useful purpose to review the numerous authorities, some of them hopelessly in conflict on this subject, although no two arguments are exactly the same. Some of the argument was proper, some of it was improper. If an objection had been made at the time, the wrongful argument could have been corrected by the court, if counsel for appellee had not done so voluntarily. In the heat of speaking thoughts sometimes shape themselves into speech which counsel would withdraw if the full effect is called to their attention. If not, the court should do so with a plain, clear statement to the jury. We require exceptions to evidence to be so preserved, and why should we make any distinction between the primary (the evidence) and the secondary (the speech on that evidence). It is sometimes said that it is embarrassing to make the objections at the time, but we fail to see how an objection made by obtaining recognition of the court and then quietly to the

court making the objection is embarrassing. A trial judge, skilled in his business and sensitive to it, ought not to find it difficult to provide such procedure and keep it free from any "wrangling or jury play."

We do not wish to be misunderstood; some argument, like some evidence, is so grave and so fundamentally destructive of the merits of the case as to be fatal to justice. In such case no instruction can save its dire effect, and the jury must be discharged. We do not believe this is such a case.

We have examined all assignments of error. The judgment is affirmed.